Good morning, everyone. All right, Judge Callahan, who is appearing by video, Judge Bress and I welcome all of you to the U.S. Court of Appeals for the Ninth Circuit here in our San Francisco courthouse. We welcome you and look forward to hearing your argument today. Just to go over a housekeeping matter, as you know, 20 minutes have been allotted for each side to present your arguments. The appellant should let me know before you start your argument how much time you would aspirationally like to reserve for rebuttal. I'll try to help you keep track of time, but please be responsible for your own time as well. When your 20 minutes is up, if one of us is asking a question and would like to continue the discussion, then by all means, please finish answering the question. All right. When you're ready, please approach the lectern. The case is Defense for Children International-Palestine v. Joseph Biden et al. Good morning, Your Honors. Katherine Gallagher for plaintiff appellants, and I'm going to reserve four minutes for rebuttal. May it please the Court. This case asks whether the executive branch can tell the judiciary it must stand aside powerless while the executive violates binding law simply because the case involves foreign affairs. Plaintiffs here, Palestinian human rights organizations, Palestinian-Americans, Palestinians in Gaza, all of whom have suffered incalculable loss to their families, including the death of more than 230 people collectively, they come to this court to enforce the profound legal duty to prevent, and not further, what is recognized as the most serious of crimes here, an unfolding genocide in Gaza that has led to mass death, destruction, starvation, and displacement. This genocide has been enabled by a massive flow of lethal U.S. munitions that has continued despite the clear warning that genocide is occurring. The text of the Constitution, foundational principles of separation of powers, and case law from Marbury through Zivotofsky make clear the political question doctrine requires that the judiciary review claims that executive officials have breached specific legal obligations enshrined in and approved by the political branches in the genocide convention, domestic criminal law, and customary international law, including in cases that involve foreign policy. First, Gallagher? Let me ask you this, and of course, you know, I start with the premise that there's no question that what has happened and what is happening is heartbreaking beyond belief. But isn't the law really dictate exactly what you said we can't do, which is essentially to step aside and defer to the foreign policy choices of the political branches? Your Honor, respectfully, we believe no. The case law is very clear, and I would highlight especially the Zivotofsky 2 cases, which I think really set the framework for this Court to examine the question before it. In Zivotofsky 1, the Supreme Court went back to foundational principles of separation of powers. It looked to see whether there was a legal question at issue, and it found that there was a question whether a statute or a law has been violated. It was not a case involving a discretionary executive branch decision, which... Well, Ms. Gallagher, I'm assuming you think that Zivotofsky 1 is your best case. Is that correct? I think it's looking at Zivotofsky 1 and then the instructions in Zivotofsky 2 to find a textual commitment, Judge Callahan, in the Constitution for the specific foreign policy powers that the executive is saying it has. And there, had the Supreme Court thought that a general invocation of foreign policy was to locate the recognition power in Article 2? Well, let me ask you this, though. You frame your claims as requiring only a legal determination, similar to that in Zivotofsky 1. But if we were to rule that the President and his executives were complicit in genocide, wouldn't we necessarily be second-guessing their balancing of the needs of an ally, regional stability and protection for civilians? Your Honor, what this case presents is a clear allegation, a well-plaid allegation, of violations of binding law. The duty to prevent genocide and aiding and abetting genocide, those are clearly established in law. And so what we are asking is what the Court did back in the founding era in the cases like Little v. Barem, or the charming Betsy, or even what the Court did in the most sensitive moments of this country in the prize cases of assessing the legality of a naval blockade during the Civil War, or the post-911 cases, a moment when this country had been attacked and was at a moment of crisis. And four times in four years, the Supreme Court said to the executive branch exactly what we're asking this Court to say now, that when there is a clear legal duty, including one coming from a treaty that the United States is bound to, like it was in Hamdan to the Geneva Conventions, and here, the genocide conventions, the Court has a role and a responsibility, a responsibility to assess executive conduct against binding law. Well, do you think it's enough just to identify? Go ahead, Judge Brass. Do you think it's enough just to identify a possible legal question? Is that the, is that all you need to claim to get around the political question doctrine? I think when you have a binding legal obligation, that is, that puts you into the box of whether you're looking at discretionary executive decision making, or whether you're looking at a binding legal obligation. And Japan Whaling makes very clear that it is those discretionary decisions, policy-making decisions, value judgments, that the courts cannot and should not look at. Those are — Right. I mean, the Court has said that, but I don't think they've said that just because you identify a legal question, that that's enough to avoid the political question doctrine. I think, respectfully, Your Honor, that in Zivotofsky, where the court of appeals, the we have a politically fraught issue here. The status of Jerusalem, political, we can't touch that. The Supreme Court looked and said, no, there is a violation alleged of a statute. And when you have a violation of a statute, of the Constitution, of a treaty, it is in the purview of the judiciary. To follow up on that point, counsel, can you address, Corey, why doesn't that provide the answer in this particular case? Because there, the plaintiffs were not allowed to sue Caterpillar. And we set the decision as to whether to grant military aid to Israel is a political decision, and that's inherently entangled with conducting foreign policy. So how do you get around that? I can appreciate that at first review. Corey v. Caterpillar, like it did for the district court, can give this Court some pause, but there are at least four reasons why this case is different than Corey v. Caterpillar. There, the U.S. conduct was not directly at issue. There was no allegation in that case that the U.S. conduct violated binding international law. The U.S. conduct that was in the background of that case was exactly the discretionary kinds of policy decision-making. It was a generic foreign aid package, which the State Department, the executive branch, can do and does every day without judicial review, where it crosses a line and where the military support that is being given. And here, I want to be very clear, we are only challenging the military assistance being sent to Israel for use in furtherance of the genocide. So the military assistance being used in Gaza in bombing raids that are killing civilians. Well, let me push back on that, though. The relief that you're seeking, articulate what that is, because it seems that the relief you're seeking is extraordinary and is different than the type of relief that, from some of the cases that you're citing in your brief. So tell me exactly what, look at what your complaint says and the relief you're asking for, and then tell me why that doesn't, in and of itself, distinguish you from some of those cases. Your Honor, we are seeking two forms of relief, and as Center for Biological Diversity v. Mattis requires, this court should assess separately our claim for a declaratory relief and our claim for injunctive relief. And a declaratory judgment that defendants are aiding and abetting or otherwise failing to prevent genocide in violation of the law is a legal determination. And that is one, again, that we believe the court could make. And it would then be up to the- Right, but by that logic, you could turn any claim into a legal claim. Any claim can be recast as a declaratory judgment claim, and that would then have the courts essentially running the United States military. Well, there are cases, Your Honor, where the courts have issued injunctions, many cases against executive conduct where there is overreach. And I would point, Your Honors, to Sierra Club, where the Trump administration took money that was allocated for one function and moved it over for another function. And the court there said, we're not making a value judgment about the movement of that funding. What we are saying is the movement of that funding violates an appropriation statute. So I do think it is the job of the judiciary under Article III, as band-aided since the time of Marbury, to actually put a check on executive conduct and to serve as a review to make sure that any course of conduct complies with the law. And I want to just- But by this logic, I mean, could somebody file a competing lawsuit that alleges that the United States support providing aid to Gaza itself violates some international law or norm? And that would be justiciable as well? Your Honor, if that were a well-pled case supported as are cases by an 85-page complaint with expert declarations from Holocaust and genocide scholars- But don't you think it would be a little bit problematic, to say the least, to have the courts trying to sift through competing claims about what role the United States should play in an ongoing military conflict? Your Honor, I want to just distinguish one point here, and that's that our claims are actually claims of genocide. So we are not looking at claims of war crimes or whether or not the United States is supporting war crimes. We are looking at whether the United States is aiding and abetting complicit in genocide. So that has a different application than the Geneva Conventions, which could apply in times of war only, and the Genocide Convention in times of war or in times of peace. So here, reviewing executive conduct, whether it is aiding and abetting the specific intent to destroy in whole or in part a people, we do think that is one of the most serious obligations on the executive, and it is the responsibility of the court to review that conduct against clearly established definitions of genocide, of complicity in genocide. This is a violation that has been recognized as actionable under the Alien Tort Statute. It has been codified in our criminal code, so there is no question that if the facts support a finding, and here we have both the duty to prevent, which is a serious risk of genocide, and we have complicity in genocide, so aiding and abetting. Weren't there genocide allegations in cases like Cori and Altamimi as well? There were not allegations, I don't believe, in Cori of genocide. There were, and the Altamimi case is very much on point with this one, Your Honor. In the Altamimi case, the D.C. Court of Appeals did the kind of discerning analysis to decide whether or not the factual claims fell in the box of something that should be reserved to the executive, like the status of the Palestinian disputed territories. It recognized that is a recognition of sovereignty that is for the executive. So in that case, it found it couldn't even decide the predicate for a war crimes case because it would be tied up with the nature of an occupation or not an occupation versus what the D.C. Court found in Altamimi, genocide, a clear definition, judicially manageable standards, and a history of this crime being adjudicated in courts. So this is much... But I think what's really significant in Altamimi is that we did the exacting search of claim by claim, as you said, but there, the claim that the Israeli settlers were committing genocide were allowed to go forward because the plaintiffs had waived any theory of liability that's based on the IDF's conduct. So the D.C. Circuit said that, well, that claim is not a political question because in answering that claim, we wouldn't have to really directly contradict any foreign policy choices. So how do we address your claims without directly condemning the foreign policy choices of the plaintiffs? Your Honor, as an initial matter, I do not think that aiding and abetting genocide, which is the conduct that the executive branch is alleged to be committing, the defendants in this case are alleged to be committing, can ever be a policy choice. It violates the law. It exceeds their constitutional powers. So that is a different predicate to the case of Altamimi as a threshold matter. But if you look at what Judge White, excuse me, if you look at what Judge White talked about, it would seem that he did express certainly sympathy for your situation and seemed to feel that there was some factual support for what you were alleging, yet he ultimately fell down on the side of that this was nonjudicial. What do we make of, did he make findings that somehow survived his determination of that this is a political question or what do we do about that? He did. We had an evidentiary hearing in that case in support of the preliminary injunction and he heard testimony from plaintiffs and from an expert. So he did make some initial findings, but he dismissed the case. What I would say is Judge White's decision did not engage at all with the Zivotofsky framework, with cases like Altamimi, with cases like Elshamari, and it adopted wholesale the analysis in Corey, which the last points I was going to make about that case, that it adopted a more accepting view of the executive that any time the magic words foreign policy are said, the case becomes a political question. The Supreme Court made very clear in Zivotofsky that is not the case. A politically fraught case does not mean a political question. And so I think here, I would urge the court to engage with that more searching inquiry. Look at the enemy combatant cases, which Judge White also did not engage with, Youngstown, which made very clear that there is no plenary power for the executive whenever foreign policy is invoked. What we've seen is time and time and time again, from the founding to the present, the Supreme Court has made clear the political question doctrine is narrow and the executive must be bound by law. I don't think there's any case that's enjoying the president from doing some of the things that you're asking us to do, right? To halt the military assistance, to change the financing, to change the weapons, to do things in the United Nations. I mean, this is not really comparable in any way to Zivotofsky, to my mind. Your Honor, what I would focus on at this point in terms of relief that we're seeking is really to stop sending weapons that are being used in Gaza in furtherance of a genocide, because that conduct constitutes aiding and abetting. It is practical assistance that has a substantial effect on the commission of genocide. And while there may not be a case on all fours with this case, and respectfully, thankfully, there haven't been allegations that the United States, the president of the United States is aiding and abetting genocide before, there are cases that show at times of war, I go back to the founding era cases of Little v. Barame, and particularly the four enemy combatant cases at a moment when the executive branch was requiring in its mind all the powers that it could to stave off a terrorist attack. And so it said, we need military commissions. We need to be able to hold people without charge and not have the involvement of the courts. And the Supreme Court made very clear that even in moments of crisis like that, the executive is still bound by law. And I would note that in Hamdan, while finding that the military commissions, as constructed by the executive, exceeded what the Geneva Conventions required, the court- I will stop as I answer this question. The court sent it back, and it said, fix the military commissions. So I think there are ways, and we would defer in large part to the expertise of the State Department who can trace where the weapons are going, how they're being used. And I think the expert declaration of Josh Paul, a former State Department official, is very instructive in terms of what the State Department could be doing to make this a very manageable remedy. Thank you. Thank you, Counsel. Good morning. Sorry, did I- am I on? Okay. Good morning. May it please the Court, Maxwell Baldy for the Government. Since Hamas attacked Israel on October 7th, the United States has worked to ensure Israel's long-term security, ameliorate the humanitarian crisis in Gaza, secure the release of all hostages, prevent the conflict with Hamas from escalating into a wider regional war, and obtain a just and durable peace. A court cannot second-guess how the Executive Branch pursues these goals, but that is what plaintiffs seek. Plaintiffs face two claims, complicity in and failure to prevent genocide. And one of those claims focuses on acts and the other on omissions, but they rely on the same theory, that the President, the Secretary of State, and the Secretary of Defense were wrong to offer unconditional support to Israel and to reject calls for a ceasefire. The acts and omissions that plaintiffs point to in order to prove those claims lie at the bottom of their policy. So to establish their claims, plaintiffs allege that the defendants voiced support for Israel's security and right to self-defense, including as early as October 7th, failed to call for a ceasefire before Israel had degraded Hamas's ability to launch another attack, vetoed UN ceasefire resolutions, refused to impose conditions on military aid, destroyed – deployed military resources to the region, and allegedly collected and shared battlefield intelligence. Under this circuit's binding precedent, those sorts of questions are not suitable for judicial resolution. Corrie – Well, would there be anything here – Mr. Baldy, I think Judge Bress sort of alleged to, well, what if the Israelis had brought a similar suit? Let's say, hypothetically, the suit had been brought by supporters of Israel seeking an  Would the outcome be the same in that case? Yes, Your Honor. As in this case? Yes, Your Honor. The outcome would be the same. The decision about whether to grant military aid to a foreign nation is a political decision that's inherently entangled with the conduct of foreign relations. That's what this Court held in Corrie, and whether it's more or less aid, whether it's conditional aid or unconditional aid, a court can't make those decisions. Those are decisions committed to the executive branch. I would point out as well that Corrie survives Zivotofsky. I think this case would come out the same way under Zivotofsky, but Corrie survives Zivotofsky, and the way we know that is that Saldana, which was argued and decided after Zivotofsky – Zivotofsky came down in March of 2012, Saldana was argued in June of 2012 and decided in December of 2012. Zivotofsky won. Saldana expressly embraced the holding of Corrie, and it applied it to that case. And so that continues to be binding law of the circuit, and I don't think there's any way around that. And the types of allegations that plaintiffs have made require a court to second-guess that. The core of their claim about supplying weapons and military aid, at least as pleaded in the complaint, is that the United States has supplied these things without conditions. The idea that a court could decide what conditions are appropriate in negotiations over supplying or delivering military aid to an ally is just beyond judicial competence. I'd also note that in the hearing before the district court – this is in the volume 2 of the record at page 43 – the plaintiffs conceded that the United States could supply some weapons to Israel – they specifically referenced Iron Dome – but not all weapons and under all conditions. And what they suggested was that the district court could hold some sort of hearing where it would, I guess, make lists of prohibited and permissible weapons and issue an injunction deciding what aid could be delivered, and that's just – that's not something the court is capable of doing. Right. That would involve a lot of discovery below. Let me ask you this, counsel, because I thought there was an alternative argument made. There's the scope of injunctive relief, which is pretty extraordinarily broad, but there's also declaratory relief that's being sought. Under the government's position, does that mean that even in instances where there's a clear violations of the Genocide Convention, whether it's – I'm talking hypothetically – whether it's done by the U.S. Government directly or by an ally of the U.S. Government, that would entirely escape judicial review if we conclude that those questions are intimately bound with the conduct of foreign affairs? I don't think it's quite that broad, Your Honor. I think one thing that we agree with plaintiffs on is that the political question doctrine requires sort of a discerning, context-specific, case-by-case, claim-by-claim analysis. And the question that you have to – that the court would have to ask is, are these allegations – can we resolve these claims without looking at sort of core policy decisions committed to the political branches? And that's – that's really my question. Even assuming that we do a discriminating analysis on a case-by-case basis, if an instance where legal duty really clashes with policy choices made by the political branches, the court is out of it. We have no role in that situation. Is that your position? Our position is that even a statutory claim can present a political question if resolving the claim requires the court to make an integral policy choice that's embedded in that question. The D.C. Circuit in Al-Tamimi said exactly that in footnote 6 of that decision. In Al-Shammari, the Fourth Circuit, while using the very broad language in a case that involved a military contractor, not the government, said essentially the same thing, that where there's an integral policy choice involved, that's not a question that's a judicial resolution. And I would distinguish it from a case like Zivotofsky, where the questions that the court were looking at was a structural separation of powers question, and it looked to text and structure and history and traditional tools of the judicial craft in making a decision, whereas here... But under your view, Mr. Baldy, would there ever be a circumstance in which a court could enjoin the executive branch from supporting alleged genocide in another country? Would there ever be such a circumstance? I have not been able to think of one, but I think this court can resolve the case on that grounds, or it can do it without reaching a categorical holding just based on the allegations here. And the complaint and sort of the... But when you say that, if there could never be, that makes your position more absolute. Your Honor, I have not been able to come up with one, but I recognize that it requires a discerning analysis, and I don't think that a question that broad is presented by this case. Well, I think they... It would seem to me that your friend on the other side relies heavily on a duty versus discretion distinction. Do you dispute as a general matter the existence of duty versus discretion distinction in applying the political question doctrine? I think largely that framework makes sense, but the question here is not just is there a legal duty, but what questions does the court have to answer to evaluate it? How does the court look at what the duty is? How do you – how is this duty fulfilled? If I can point to some of the allegations in the complaint, because I think they're kind of quite extraordinary, the sort of things that plaintiffs relate to as acts and omissions supporting their claims. Paragraph 192, the Pentagon announced the deployment of a second carrier strike group to the region. Paragraph 206, the United States exercised its veto power in the U.S. Security Council to block calls for a ceasefire. These are the types of culpable acts and omissions they're talking about, and they fall well within the heart of executive discretion to conduct the country's foreign policy. I'm happy to answer any other... The district court view of political question doctrine, under the district court's view, would executive officials essentially be immune from suits alleging a violation of any international law because such suits would always implicate foreign policy judgments? No, Your Honor, and I don't think that that is – I think that's broader than what the district court held. I think the best reading of the district court's opinion is that in the parts of the opinion where it sort of applied the doctrine to this case, it said this case is squarely controlled by Corey, and we agree with that. I think there is – it's possible that you could have... It almost seemed, though, when the district court was analyzing it and made certain findings that you were going to lose, but then you didn't lose. So Your Honor, I don't believe the district court made anything that could be called a finding. I think when a court lacks jurisdiction, all it has the power to do is say so and dismiss the case. So there's some dicta in that opinion, but I don't think that those are findings. Well, if hypothetically – I'm saying hypothetically because we haven't conferenced or anything, but if hypothetically we were to find that it is a political question and dismiss it, what effect going forward, what the district court did make some fairly specific comments, what effect does that have in your view? Does it live on? You know, Your Honor, I think you review judgments and not opinions, and so the correct disposition is to affirm. If the court thinks that those were comments that the district court didn't have the power to make or didn't have a basis to make, it can certainly say so, but the disposition would be to affirm. I'm happy to answer any other questions, but otherwise, the district court lacked jurisdiction and we'd ask that the judgment be affirmed. Thank you. Judge Callahan, do you have any additional questions? All right. Thank you for your argument. I do not. Thank you. Let's put three minutes on the clock. Thank you, Your Honor. Just a couple of quick points in rebuttal. I just want to ground where our duty discretion distinction comes from. It comes from the Supreme Court in Marbury v. Madison. It was in that case that Justice Marshall made clear that the executive possesses a discretion, but when it comes to a legal duty, the executive is amenable to the laws for his conduct, and what we are hearing from the government is that there is no constraint in law, and that simply cannot be, and Supreme Court precedent does not support such a broad finding, and I think it is a profoundly dangerous finding for a court to make that the executive is not bound by any law, be it a treaty, be it a statute, or be it the Constitution. It takes us back to a place that Justice Jackson made very clear the United States rejected when it said no king in this country. It made three co-equal branches of government, and it said that the judiciary should serve as a check, and we ask the judiciary to do that today because since this case has been filed, the death toll in Gaza has gone from 11,000 to over 40,000, and it is not simply the failure to put in place a ceasefire resolution that has caused that. Something we didn't hear the government engage with at all is the weapons that it has sent, the more than million pieces of ammunition that have been used in Gaza, the tens of thousands of missile kits that have been sent, including the 250 and 2,000-pound bombs just sent last month. So are you saying that the United States should not be allowed to send any military aid to Israel? No, Your Honor. That is not our position. Who will decide this then? I think there could be a discriminating analysis of what the weapons are and where they're being used, and this is something we, again, point Who do you want to make that judgment? Do you want the court to make that judgment? We believe that the State Department and the Defense Department can do that at the front line. The State Department issued a report last month on where U.S. weapons are being used and how they're being used, and it made the conclusion that it is reasonable to assess that weapons sent by the United States being used in Gaza have been used in violation of international law. Making that finding wasn't enough for the State Department to say we will not continue to send weapons for use in Gaza. In other contexts, like in the Ukraine context, the State Department has put geographical limitations on where U.S. weapons can be used. It has put end-use limitations as a regular basis when it gives military aid. So this is not a case about the Iron Dome. This is a case about weapons that are being used to further a genocide in Gaza, and we are Well, counsel, what you want us to do is to find that there is jurisdiction in the case and send it back to the district court, correct? That is what we're That's the bottom line. And then would you then be entitled to have discovery from the executive branch on how these decisions are being made, where the weapons are being used, and to delve into all of the considerations that led to the policy choices by the U.S. government? No, Your Honor. I don't think we would need such extensive discovery. First I What discovery would you be entitled to? There is a lot of information in the public domain because of reporting that the State Department and the Defense Department have to do about weapons deliveries. So there are certain weapons that it is clear from its own investigations, from U.N. investigations, which weapons are being used where. It's the kind of discovery that might be akin to what happens in a persecution claim for a removal proceeding or a claim about more likely than not that an immigrant At the end of the day, if your clients disagree with the United States government on which weapons are permissible, you're asking a court to tell everybody what the answer to that question is. Your Honor, there could be questions that come up down the line, as there do in every case. I think at this stage where we are at is that the vast majority of weapons being used to further the genocide are coming from the United States. So stopping at least the flow that we have at this point, and where there could be discussions or debates, there may have to be some due respect given to the Department of Defense or the Department of State. We are not at that point. And I would just remind the Court we're at the motion to dismiss. So there could be some discovery, but again, I think there is a lot of information that we already have and some baseline orders that could help to alleviate a genocide. All right. Thank you very much, Counsel, for both sides for your argument today. It's been very helpful. The matter is submitted. We'll be in recess.
judges: CALLAHAN, NGUYEN, BRESS